UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> DAVID S. SARGENT, and CHRISTOPHER M. KLUNDT, <br><br> Defendants. | Case No. 22-cv-168 <br><br> **JURY TRIAL DEMANDED** |

# COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Defendants David S. Sargent and Christopher M. Klundt, alleges as follows:

## SUMMARY

1. This case involves insider trading by Defendant David S. Sargent ("Sargent") in the securities of Chegg, Inc. ("Chegg"). Sargent purchased Chegg options and stock on the basis of material, nonpublic information that was tipped to him by his close friend and former colleague, Defendant Christopher M. Klundt ("Klundt").

2. On May 1, 2020, Klundt, a Chegg employee, attended an earnings "preview" meeting during which Chegg senior management confidentially discussed what would be disclosed in Chegg's upcoming May 4 earnings release; including that Chegg's first quarter earnings would exceed market expectations.

3. Almost immediately after the meeting, Klundt called Sargent. Within an hour of that call, Sargent, who had never before purchased Chegg stock or options, began

1

purchasing $40,000 worth of Chegg stock and call options, many of which were out of the money.

4. On May 4, 2020, Chegg announced that total net revenues for first quarter 2020 had soared to $131.6 million, a 35% year-over-year increase. Chegg's financial performance had exceeded the market's expectations and the company's prior forecasts. The next day, Chegg's stock price sky-rocketed.

5. Following Chegg's May 4 earnings call, Klundt texted his friend Sargent this emoji: 

6. Sargent responded by congratulating Klundt on the big announcement.

7. On May 5, Sargent sold all his Chegg options—netting a profit of more than $100,000, a three trading day return of approximately 347%. On June 19, 2020, Sargent sold his Chegg stock for a net profit of more than $7,000.

8. Months later, when financial regulators asked Klundt if he knew Sargent and others who had traded Chegg securities in advance of Chegg's May 4 earnings release, Klundt denied knowing Sargent.

9. As a result of the conduct alleged herein, Defendants Sargent and Klundt violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. The Commission seeks a permanent injunction against Defendants Sargent and Klundt, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, civil penalties pursuant to Section 21A of the

Exchange Act [15 U.S.C. § 78u(d)(2)], and such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u(e), and 78aa].

11. Venue lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Northern District of Illinois, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. For example, one of the defendants resides in the Northern District of Illinois, the tips alleged herein were communicated to one of the defendants while he was in this district, the trades at issue were ordered by one of the defendants while he was in this district and some of the trades at issue occurred on the Chicago Board Options Exchange.

## COMMONLY-USED TRADING TERMS

12. A "call option" is a type of contract that gives the owner (*e.g.*, the one buying the call option) the right, but not the obligation, to buy 100 shares of the underlying security at a specified price within a specified time. The "strike price" is the price per share at which the option owner can buy the underlying security if he chooses to exercise the option. The "expiration date" is the last day that an option contract is valid. If the option owner chooses not to exercise the option (in other words, not to buy 100 shares of the underlying stock), the option expires and becomes worthless, and the owner losses the money he paid to buy the option. A call option becomes more valuable to the option owner as the price of the

3

underlying security rises relative to the strike price. Therefore, a buyer of a call option is betting that the price of the underlying security will rise.

13. If the strike price of a call option is below the price at which the stock is trading, the call option is considered "in-the-money" because the exercise of the option would allow the holder to make a profit by purchasing the stock at the strike price and selling it for a higher price. If the strike price is above the price at which the stock is trading, the call option is "out-of-the-money" because the exercise of the option to purchase the stock at the strike price and immediate sale of the stock at a lower price would result in a trading loss. For a given expiration month, out-of-the-money call options are cheaper to buy than those that are in-the-money.

14. Options trading can provide "leverage." Because a call option only conveys the *right* to buy or sell an underlying asset, options are significantly less costly than buying the underlying asset outright. This means that the buyer of an option can pay a relatively small premium for market exposure in relation to the contract value (usually 100 shares of the underlying stock). An investor can see large percentage gains from comparatively small, favorable percentage moves in the underlying product.

**DEFENDANTS**

15. <u>David S. Sargent</u>, age 37, is a resident of Glenview, Illinois. At the time of the relevant conduct, Sargent was an attorney at Sargent Law Offices in Chicago, Illinois and the vice president of a privately-held software company based in Chicago, Illinois. Sargent has also been on faculty of Loyola University Chicago's School of Environmental Sustainability since 2014. He is currently working as the assistant general counsel of a privately-held business based in Chicago, Illinois.

16. <u>Christopher M. Klundt</u>, age 38, is a resident of San Francisco, California. At the time of the relevant conduct, Klundt was the General Manager of a Chegg subscription service named Chegg Prep. He was later promoted to Chegg's Vice President of Content and Knowledge. Klundt has been close friends with Sargent since 2005, when they attended the University of Wisconsin-Madison together. While in college, Klundt and Sargent co-founded ClassConnection (later changed to StudyBlue.com), an online studying platform for high school and college students.

## RELATED ENTITY

17. <u>Chegg, Inc.</u>, is a Delaware corporation headquartered in Santa Clara, California. Chegg provides online textbook rentals, online tutoring, and other online educational services for students. The company's common stock is registered with the Commission pursuant to Section 12(b) of the Securities Exchange Act of 1934 and trades on the New York Stock Exchange under the ticker "CHGG."

## FACTS

### I. Sargent and Klundt's Friendship

18. Sargent and Klundt became friends while attending college together at the University of Wisconsin-Madison.

19. In or around 2007, Sargent and Klundt co-founded ClassConnection, later renamed StudyBlue.com, an online studying platform for high school and college students. StudyBlue.com allowed students to collaborate and to share study materials for classes and exams.

20. Sargent left StudyBlue.com after graduating college and later earned a law degree from the University of Illinois College of Law.

21. Klundt remained with StudyBlue.com and relocated the business from Madison, Wisconsin to San Francisco, California in 2012.

22. Sargent and Klundt remained close friends. Klundt was a groomsman at Sargent's wedding and over the years, Sargent and Klundt continued to communicate regularly with each other through texts, phone calls, and emails.

**II. Chegg, Inc.**

23. Founded in 2005, Chegg is an education technology company based in Santa Clara, California. It provides digital and physical textbook rentals, online tutoring, and other subscription based services to high school and college students. Students subscribe to Chegg's online services, which it collectively refers to as "Chegg Services."

24. In fiscal year 2020, Chegg's net revenues exceeded $640 million, a 57% increase from 2019 ($410 million).

25. Beginning in 2010, Chegg made a series of acquisitions to expand its line of Chegg Services.

26. In July 2018, Chegg acquired Sargent and Klundt's company, StudyBlue.com, for $20.8 million. StudyBlue became a Chegg Service and was renamed Chegg Prep.

27. Klundt remained employed by Chegg after the acquisition.

28. From 2018 through January 2021, Klundt was the General Manager of Chegg Prep.

29. In January 2021, Klundt was named Chegg's Vice President of Content and Knowledge.

### III. Klundt Owed a Duty of Trust and Confidence to Chegg

30. Klundt owed a duty of trust and confidence to his employer Chegg and was obligated to maintain the confidentiality of information that he learned in connection with his employment and to refrain from trading on and to refrain from giving nonpublic information to others who may trade on the basis of that information.

31. At all relevant times, Chegg had an Insider Trading Policy which was distributed to all employees. Each Chegg employee was required to review and to sign a receipt and acknowledgement form, in which the employee certified that he or she:

    a.    Received and read the Insider Trading Policy;

    b.    Received satisfactory answers to any questions he/she had regarding the Insider Trading Policy;

    c.    Understood and agreed to comply with the Insider Trading Policy; and

    d.    Understood that his/her failure to comply in all respects with the Insider Trading Policy is a basis for termination of employment.

32. Chegg's Insider Trading Policy stated: "It is also illegal for any employee, officer, director of or consultant to [Chegg] to give material nonpublic information to others who may trade on the basis of that information."

33. The Insider Trading Policy defined "nonpublic information" as information that has "not been widely disseminated to the public, for example, through major newswire services, national news services, SEC Form 8-K or other filings …."

34. The Insider Trading Policy defined "material information" as information that "would be expected to affect the investment or voting decisions of a reasonable stockholder or investor, or if the disclosure of the information would be expected to alter

significantly the total mix of the information in the marketplace about the company. In simple terms, material information is any type of information that could reasonably be expected to affect the market price of the Company's securities. Both positive and negative information may be material."

35. On July 4, 2018, Klundt signed the Chegg Insider Trading Policy receipt and acknowledgement form.

### IV. Klundt Possessed Material, Nonpublic Financial Information About Chegg

36. As the General Manager of Chegg Prep in 2020, Klundt was privy to nonpublic financial information and other metrics concerning Chegg's financial performance.

37. Beginning in at least March 2020, Klundt was asked to prepare new metrics on Chegg Prep's subscriptions and user engagements for Chegg's upcoming first quarter earnings release. Internally, the metric was considered "part of [Chegg's] core earnings metric" to be released to the public.

38. On April 14, 2020, Klundt received an invitation to an internal, virtual Chegg "pre-earnings" meeting ("Earnings Preview") to be held on May 1, 2020 at 12:00 pm ET,[1] to preview the company's first quarter 2020 performance and second quarter 2020 forecasts which would be released to the public on May 4.

39. On April 16, 2020, Klundt was asked to review Chegg's first quarter numbers "for all metrics" relating to Chegg Prep and given access to a spreadsheet containing a summary of Chegg's earning metrics, including first quarter 2020 net revenue breakdowns by division and information regarding subscribers and active users for Chegg Services.

---

[1] All times identified in the Complaint refer to U.S. eastern time.

8

**V.     Klundt Tipped Sargent About Chegg's Positive Earnings Release**

40.     On April 21, 2020 at 11:30 a.m., Klundt texted Sargent, "Good talking to you guys. I miss spoke [*sic*]. The earnings call with Wall Street is May 4[th]." At 12:50 p.m., Sargent placed a limit order for 28 shares of Chegg stock with a limit price of $35.15. The order was never executed because the price of Chegg's stock did not meet his limit price of $35.15. This was the first time Sargent had placed an order to trade in Chegg securities.

41.     Friend A, a childhood friend of Sargent, assisted Sargent in executing trades in Chegg securities. Friend A met Klundt through his friendship with Sargent.

42.     On April 21 at 4:38 p.m., Sargent called Friend A and they had a 51-minute phone conversation.

43.     On April 22, Klundt and Sargent spoke via Zoom (a video teleconferencing software program).

44.     Chegg held quarterly Earnings Previews in which Chegg's CEO and other executives confidentially previewed information that the company would release to the public in its official earnings release days later. The confidential information disseminated at the Earnings Previews included the company's quarterly earnings, subscription numbers, and quarterly forecasts.

45.     The Earnings Previews were typically in-person meetings, but in 2020, they were held virtually through Zoom due to the Covid-19 pandemic.

46.     Klundt attended the May 1, 2020 Earnings Preview during which Chegg senior management confidentially discussed what would be disclosed in Chegg's upcoming May 4 earnings release, including that Chegg's first quarter earnings would exceed market expectations.

47. Information discussed at the May 1 meeting was confidential and not publicly disclosed until Chegg's earnings release on May 4 at approximately 4:30 p.m. ET.

48. On May 1, 2020 at 10:44 a.m., the day Klundt attended Chegg's Earnings Preview, Friend A texted Sargent: "We should discuss the [C]hegg position before market close – what times are you free today?"

49. Klundt attended Chegg's first quarter Earnings Preview at 12:00 p.m. The meeting was scheduled to end at 1:30 p.m.

50. At 1:26 p.m. Sargent and Friend A spoke on the phone for 37 minutes. At the time, Sargent had not placed any orders for Chegg securities.

51. At 2:03 p.m., Klundt attempted to call Sargent—the call lasted 3 seconds.

52. At 2:04 p.m., Sargent returned Klundt's call and the two spoke for 4.5 minutes.

53. Between 2:41 p.m. and 2:51 p.m., Sargent purchased 120 and 151 shares of Chegg stock through his Vanguard account for $42.24/share and $42.03/share, respectively. These were his first ever purchases of Chegg securities. The total purchase price of Sargent's shares was $11,415.

54. At 2:58 p.m., Sargent called Friend A, speaking to him for 8 minutes.

55. At 3:40 p.m., Sargent again called Friend A, speaking to him for 5 minutes.

56. Three minutes later, at 3:43 p.m., Sargent, through Friend A, placed orders in Sargent's TradeStation brokerage account for 214 Chegg call options. Sargent purchased 48 call options at a strike price of $40, and 166 out-of-the-money call option at a strike price of $50. Both sets of option contracts expired in two weeks (on May 15, 2020). The total purchase price of Sargent's option contracts was $29,765.

57. Sargent's May 1, 2020 purchases of Chegg $40 calls and $50 calls represented approximately 63% and 55% of the daily series trading volume in those option contracts, respectively.

58. In total, Sargent invested over $41,000 in Chegg securities on May 1.

59. On May 1, 2020, Chegg's stock price traded at prices between $41.65 and $42.45, and closed at $42.36.

60. In order for Sargent's $40 call options to be profitable, Sargent had to be confident that Chegg's stock price would not fall below $40 during the two weeks he was able to exercise the call option.

61. In order for Sargent's $50 call options to be profitable, Sargent had to be confident that Chegg's stock price would *increase* above $50 within the next two weeks he was able to exercise the call option. Given the closing price of Chegg's stock on May 1, Sargent had to be confident that Chegg's stock price would *increase* over 18% in the next two weeks.

62. But Sargent already knew that his investments would pay out.

## VI. Chegg's May 4 Earnings Release

63. On May 4, 2020 at approximately 4:30 p.m., Chegg informed the public of what it had told Klundt and other Chegg employees on May 1: Chegg announced total net revenue of $131.6 million for first quarter 2020, representing a 35% year-over-year increase. Chegg attributed its "dramatic growth during this time" to a 35% year-over-year increase in subscribers.

64. Chegg's May 4 earnings release consisted of (a) a phone call on which Chegg senior management disclosed to the public Chegg's quarterly financial results and other

information regarding the company and (b) a near-simultaneous press release that contained prepared remarks by Chegg's CEO and CFO and financial figures disclosed on the call (collectively, the "Earnings Release").

65. Chegg's CEO informed the public that "Chegg [had] performed ahead of our expectations" and its CFO stated that Chegg "see[s] these trends continuing into Q2."

66. Chegg's quarterly earnings were $0.22 per share, which exceeded analysts' consensus expectations by $0.07 per share, or by roughly 46%.

67. Sargent and Friend A both listened to the May 4 Earnings Release call by phone and texted each other throughout the call. At one point, Friend A texted Sargent, "They didn't bring up the 200% figure. They said 45% growth in Q2. If you're right, that's a conservative estimate."

68. Sargent responded, "[Y]ep, it could be that 45% represents subscriber revenue whereas 200% would be the spike in online activity, I do think the 45 figure is conservative regardless."

69. After the Earnings Release on May 4 at 8:58 p.m., Klundt texted Sargent this  emoji:

70. Sargent responded, "Congratulations on a great quarter! The analysts are swooning."

71. Because Chegg's May 4 Earnings Release occurred after the New York Stock Exchange had closed (4:00 p.m.), the Earnings Release sent Chegg's stock soaring on May

5. On May 5, Chegg's stock opened at $53.60 and closed at $57.92, up $14.13, or approximately 32% from the previous trading day's close.

72. The following table reflects a timeline of communications and transactions discussed in Sections V and VI.

**Table 1 – Timeline of Communications and Transactions**

| Date | Time (ET) | Event |
|---|---|---|
| April 21 | 11:30 a.m. | Klundt texts Sargent about the Chegg Earnings Release on May 4. |
| April 21 | 12:50 p.m. | Sargent places a limit order for Chegg stock that is never executed. |
| April 22 | 10:27 p.m. | Klundt and Sargent meet over Zoom. |
| May 1 | 10:44 a.m. | Friend A texts Sargent asking to discuss "the Chegg position." |
| May 1 | 12:00 p.m. | Klundt attends the internal Chegg Earnings Preview meeting. |
| May 1 | 2:03 p.m. | Klundt attempts to call Sargent. |
| May 1 | 2:04 p.m. | Sargent returns Klundt's call for 4.5 minutes. |
| May 1 | 2:41-2:51 p.m. | Sargent buys 120 shares and 151 shares of Chegg stock @ $42.24/share and 42.03/share, respectively. |
| May 1 | 2:58 p.m. | Sargent calls Friend A for 8 minutes. |
| May 1 | 3:40 p.m. | Sargent calls Friend A for 5 minutes. |
| May 1 | 3:43 p.m. | Sargent, through Friend A, buys (1) 48 15May20 calls @ $40 and (2) 166 15May20 calls @ $50 |
| May 4 | 4:30 p.m. | Chegg's Q1 Earnings Release. |
| May 4 | 4:52 p.m. | Friend A texts Sargent and references a "200% figure." |
| May 4 | 8:58 p.m. | Klundt texts Sargent money-mouth emoji. |
| May 4 | 9:18 p.m. | Sargent texts Klundt congratulations re: Chegg's performance. |

## VII. Sargent Nets More Than $100,000 In Profits *In 3 Trading Days.*

73. Sargent, through Friend A, immediately began selling his Chegg options on the afternoon of May 5, realizing a profit of $103,306.64, or an approximate 347% return on investment *in 3 trading days*.

74. Sargent also sold all of his 271 shares of Chegg stock weeks later, on June 19, 2020, at a price of $68.12 per share, realizing a profit of $7,057.21, or an approximate 61.2% return on investment. Sargent's unrealized profits on his Chegg stock on May 5, 2020 were $4,280.81.

13

75. In total, Sargent netted more than $110,363 on the Chegg securities he purchased on May 1.

| Account | Purchase Date | Sales Date | # of Contracts | # of Shares | Purchase Price | Proceeds | Profit |
|---|---|---|---|---|---|---|---|
| TradeStation | May 1 | May 5 | 214 | 0 | $29,765.49 | $133,072.13 | $103,306.64 |
| Vanguard | May 1 | Jun 19 | 0 | 271 | $11,415.51 | $18,472.72 | $7,057.21 |

76. On September 14, 2020, the Financial Industry Regulatory Authority ("FINRA"), in connection with a non-public investigation, sent a letter to Chegg identifying various individuals and entities that traded Chegg securities around the May 4 Earnings Release. The list, which included Sargent's name and location as "Chicago, IL," was to be circulated to all Chegg employees who attended the May 1 Earnings Preview meeting or otherwise had advance knowledge of events leading up to the May 4 Earnings Release.

77. FINRA's letter requested that if a Chegg employee knew a person identified on the list (*e.g.*, Sargent), then that employee should provide a "detailed description of any past or present relationship between the person(s) at the company and the individuals on the enclosed list," including (a) the name of the person who identified the individual, (b) the nature and history of their relationship, (c) the frequency of contact, (d) a summary of any conduct that occurred between April 1, 2020 through May 4, 2020, and (e) a statement regarding whether any information regarding Chegg's business activities may have been disclosed.

78. On September 28, 2020, Chegg's associate general counsel sent FINRA's letter request to all Chegg employees who "had knowledge of or were privy to the events leading up to Chegg's May 4, 2020 announcement of its first quarter financial results … and

14

guidance for the second quarter of 2020." Klundt was included in that group of Chegg employees.

79. Chegg's legal team instructed the recipients, including Klundt, to identify whether they "kn[ew] or ha[d] investments with any person or entity listed in FINRA's attached letter."

80. On September 29, 2020, Klundt falsely responded that he did "not recognize any individual or entity on the FINRA list ….'"

## CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

81. The Commission realleges and incorporates by reference paragraphs 1 through 80, as though fully set forth herein.

82. Klundt had a duty to keep material nonpublic information regarding Chegg's financial results confidential. Klundt learned material, nonpublic information about Chegg's financial results as a result of his employment at Chegg, and he owed a fiduciary or similar duty of trust and confidence to Chegg and its shareholders to keep the information confidential and to refrain from tipping the information to others. In breach of that duty, Klundt communicated material, nonpublic information to Sargent, his close personal friend, knowing, or having a reasonable expectation or recklessly disregarding, that he would use the information in connection with securities trading. Klundt communicated material nonpublic information to Sargent in exchange for a personal benefit or with the expectation of receiving a benefit.

83. Sargent traded on the basis of material nonpublic information despite knowing, or being reckless in not knowing, that the information was material and

15

nonpublic. Sargent knew, was reckless in not knowing, should have known, or consciously avoided knowing that the material nonpublic information was disclosed in breach of a fiduciary duty or obligation arising from a similar relationship of trust or confidence. Sargent knew, was reckless in not knowing, should have known, or consciously avoided knowing that Klundt, his close personal friend, improperly disclosed the material nonpublic information in exchange for a personal benefit or with the expectation of receiving a benefit.

84. By engaging in the conduct described above, defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

85. By reason of the conduct described above, defendants, directly or indirectly, violated and, unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

**I.**

Enter a Final Judgment permanently restraining and enjoining defendants and their agents, servants, employees and attorneys, and those persons in active concert or

participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## II.

Enter a Final Judgment directing defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]; and

## III.

Grant such other and further relief as this Court may deem just and proper.

### JURY DEMAND

Dated January 11, 2022

Respectfully submitted,

By: /s/ Kevin A. Wisniewski
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
Kevin A. Wisniewski (Wisniewskik@sec.gov)
Daniel J. Hayes (HayesDJ@sec.gov)
Austin Stephenson (StephensonAU@sec.gov)
175 W. Jackson Bldv, Suite 1450
Chicago, Illinois 60604
Phone: (312) 353-3790
Facsimile: (312) 353-7398